Peelle, J.,
delivered the opinion of the court:
The question presented for our decision arises on the claimants’ motion to incorporate into and consider as part of the record of this case the transcript of the original evidence from the Supreme Court of the United States in the case of G. A. Le More & Co., appellants, v. The United States, appealed from the district court for the southern district of Illinois, Ouachita Gotton (6 Wall., 521), which transcript is now in the possession of the clerk of this court.
The case before us was referred by resolution of the Senate July II, 1897, under section 14, act of March 3,1887 (24 Stat. L., 505; 1st Supp. to it. S., 559 and 562), for the court to ascertain and report to the Senate the facts in relation thereto. The case in the Supreme Court originated this wise:
After the capture of New Orleans by the military forces of the United States and its restoration thereby to the Federal jurisdiction in May, 1862, the claimants, among others, purchased cotton in Louisiana which had previously been sold bjr its owners to the Confederate government and left stored on a plantation on the Ouachita, where it had been raised.
Two of the claimants thereto purchased direct from the Confederate cotton agent, while in February, 1864, one Leon Queyrous, a naturalized citizen of the United States, residing at New Orleans, as found by the court, purchased of Buckner. *11 also an agent of the Confederate Government, 830 bales of the cotton so stored, and he in turn sold the same in March following to Le More & Co., claimants herein, through whom they claim.
The rights, if any, of the two other claimants to that and other cotton, as set forth in the case referred to, are not involved in the case before us, and need not therefore be considered.
The cotton in controversy in this suit was, with other cotton, seized on the bank of the Ouachita River in insurgent territory by the naval forces of the United States in April, 1864:, and taken to Cairo, Ill., and libeled as a prize of war in the district court of the United States for the southern district of Illinois.
The court, by an interlocutory decree, ordered the cotton sold and the proceeds thereof to be held subject to the future order of the court, which was done.
The claimants, including Le More & Co., intervened and filed their respective petitions.
Le More & Co., then and now citizens of France, claimed in that action the 830 bales of cotton so purchased by them from Queyrous.
The case was prosecuted under the nonintercourse act, July 13, 1861 (12 Stat. L., 255), and the proclamations of the President issued by authority thereof, the last of which proclamations was issued April 2, 1863 (17 Stat. L., 730), before the purchase of the cotton by the claimants or by Queyrous.
In the district court the claims were consolidated, and, being considered by the court, a decree was entered against all of the claimants dismissing their respective petitions. They each took an appeal to the Supreme Court, and the several decrees so entered were affirmed on the ground, substantially, that while by the terms of the last, if not of the first, proclamation so issued by the President “the port of New Orleans” was excepted from the territory declared to be in insurrection, whereby its citizens “were clothed with the same rights of property and were subject to the same inhibitions and disabilities as to commercial intercourse as the inhabitants of the loyal States,” yet as the cotton in controversy was purchased in insurgent territory by Queyrous, who *12 was at the time a naturalized citizen of the United States residing in New Orleans, without a permit from the President, who alone was clothed with authority to issue the same, ho acquired no title to the cotton, and therefore had none to .convey to the claimants.
After the Supreme Court had affirmed the decree of the lower court dismissing the claimant^’ petition, its attention at a subsequent term was called to certain omissions in the printed evidence, showing that in the original evidence, which was before the district court, Queyrous had testified that at the time he sold the cotton to the claimants he was a Frenchman., a natwe of France residing in Mexico, but the court declined to review its action or to modify its rulings, saying:
“To make the allowance of the prayer of the petitioners available to them, through the correction of the alleged error, it would be necessary to recall the mandate sent to the inferior court, to set aside the decree rendered at the last term, to rehear the cause and make a new decree. This can not be done without reversing the settled and uniform practice of the court, and the petition must, of course, be denied.”
In that case, both in the court’s statement and opinion, pages 523 and 529, it is found and stated that Queyrous was a naturalized citizen of the United States, residing in New Orleans at the time of his purchase from the Confederate agent; and, therefore, whether the omission from the printed evidence before the Supreme Court was or was not sufficient to have justified a different conclusion from that the court reached is not for us to determine. But we will say that Queyrous, who testified that at the time he sold the cotton to the claimants he was a natwe of France, residing in Mexico, also testified that he was a naturalized citizen of the United States, residing at the outbreak of the civil war in New Orleans. Quey-rous may have been a resident of New Orleans at the time of his purchase of the cotton from the Confederate agent, and a resident of Mexico at the time of the sale to the claimants, and if so, his change of residence would not validate his title to property which was void as against the United States by reason of his purchase from the Confederate Government while he was residing in New Orleans. However, it is not the province of the court to go behind that case to consider *13 the evidence for the purpose of laying a foundation to vary the rights of the parties as therein determined any more than it would be were the case before us under our general jurisdiction for judgment.
Certainly the Congress, by the language of the section of the act under which the reference was made, did not intend that the court, in the ascertainment of the facts for their information, should be governed by any other rules of evidence than those applicable to cases coming under our general jurisdiction; and if that be true, then it follows that the best evidence of the citizenship and residence of Queyrous, through whom the claimants assert title to the cotton, must be found in the case thus determined, which has become resjudÁcata.
The rule is elementaiy that where a controverted fact has been judicially established upon the evidence by a court of competent jurisdiction such fact so established can not be again controverted in any other action of a not higher nature between the same parties. {Spicer’s case and authorities there cited: 5 C. Cls. R., 31; Hopkins v. Lee, 6 Wheat., 109, 113; Case v. Beauregard, 101 U. S., 688.)
Furthermore, it was held in Chapman v. Smith (16 How., 114, 133) that “where the facts in issue appear upon the record, either expressly or by necessary intendment, it is not competent to contradict them, as this would be contradicting the record itself;” and further, that “if the matters involved in issue do not appear upon the record, then it is competent to ascertain them aliunde.”
Nor can the issue upon which a decree has been pronounced be again retried in a collateral action, though the evidence upon which the case was heard is in the record. (Franklin, Company v. German Saving Bank, 112 U. S. R., 93.)
Inasmuch as the Supreme Court took jurisdiction of the case and disposed of it on its merits, the jurisdiction of the district court can not be questioned here.
For the reasons stated we must hold that the doctrine of res judicata is applicable to cases referred to the court under the act March 3, 1887, or the Bowman Act, for the reason, among others, that the court in the ascertainment of the facts in cases so referred is governed by the well-established elementary rules of the law of evidence, and being so governed, *14 the facts in such cases can be found only by judicial means and methods. (Nance Case, 23 C. Cls. R., 463, 468.)
Any evidence, therefore, which the claimants may offer in the case before us in respect of the ownership of the cotton in controversy, which was adjudicated in the former case, can not be admitted by the court to contradict the rights of the the parties there determined.
Conceding the rule contended for by the claimants to be that evidence used in a former cause between the same or substantially the same parties may be used in a subsequent cause between them, it does not follow that such evidence may be used to reestablish a claim, legal or equitable, which has become res judicata.
If such were the rule, the maxim that it is in the interest of the Commonwealth that litigation end would be reversed.
So that while it is the duty of the court to find the facts for the information of the Congress in all cases referred under the act, we must do so in strict conformity with the rules of judicial procedure from competent and admissible evidence taken by authority of law. (Allen's Case, 28 C. Cls. R., 141; Vance Case, 30 C. Cls. R., 252.)
From what has been said it follows that any finding which the court may make in regard to the citizenship or residence of Queyrous, through whom the claimants assert title, must be made in conformity with the facts which were determined in the case referred to.
It may be contended that inasmuch as the act of 1887 provides for the reference to the court of equitable as well as legal claims against the United States, that therefore in such cases the jurisdiction and scope of the court’s power in the ascertainment of facts is enlarged; but the answer to this is that equity follows the law, and the same rules of evidence are applicable in such cases.
The motion is therefore overruled.
WeldoN, J., did not sit in this case and took no part in the decision.